The argument is that it did not appear that any creditor or any person ever saw or received any information from the rating put into the report. This objection was not taken, and, if it had been, it may be that it might have been obviated. The company was evidently getting a good deal of credit about that time. Besides, it does not seem to be entirely settled that enough was not shown to make it proper as a contemporaneous act reflecting on the question of intent. The statement that Mr. Callahan was still a director was not true. It already appeared that he was the only responsible man connected with the business, and Mr. Sheridan, for the company, was willing a rating should be based on his responsibility, and it was so entered. In Hersey v. Benedict, 15 Hun, 282, 287, Judge Talcott says:

"The same principle upon which the evidence of cotemporaneous frauds is admitted, as bearing on the intent of the party in committing the fraud principally in question, would lead to the admission of evidence of an attempt to commit a similar fraud, at about the same time, by similar means, whether successful or not."

We are not satisfied that there was any such error in admitting the evidence, or in denying the motion to strike out, as would properly call for a reversal.

3. After it was proved on the part of defendant that he acted under an execution against the company, and a valid levy was conceded, the plaintiffs called the defendant as a witness, and asked the question, "Were you indemnified in this case?" An objection to this as "incompetent, irrelevant, and immaterial" was overruled, and exception taken. This ruling is claimed to be erroneous. This, strictly speaking, may be so, but it is a little difficult to see how the defendant was harmed. The real controversy was between the plaintiffs and the judgment creditor whom the defendant represented, and the defendant had no personal interest in the matter. Without the evidence on the subject, the jury would very likely have inferred that the sheriff was in fact indemnified.

We are of the opinion that no sufficient reason for reversal appears, and that the judgment should be affirmed. Judgment and order affirmed, with costs. All concur.

---

(11 Misc. Rep. 595.)

ROOSEVELT v. LAND & RIVER IMP. CO. et al.

(Supreme Court, Special Term, New York County. March 22, 1895.)

1. TRUSTS—FOLLOWING TRUST FUNDS — INVESTMENT IN INDIVIDUAL NAME OF TRUSTEE.

Where one of two trustees had funds of the trust estate in his possession, and, with the consent of his cotrustee, invested part thereof in non-negotiable securities, but took title thereto in his individual name, such securities, as between the trustee making the investment or his general assignee and the trust estate, are the property of the trust estate, though the money invested could not be traced directly to any specific funds.

2. SAME—RIGHTS OF THIRD PERSONS—ESTOPPEL TO DENY.

Where a trustee negligently permits his cotrustee to take in his own name mortgage bonds purchased with trust funds, the trust estate is

estopped to dispute the validity of an assignment of the bonds by such trustee as collateral security for a loan procured by him.

**8.** SAME—REMEDY AGAINST THIRD PERSON.

Where a trust estate is estopped to deny the validity of an assignment by the trustee of securities purchased with trust funds as collateral security for a loan procured by the trustee for a corporation of which he was an officer, the corporation, in an action in equity to which all the interested persons are parties, will be compelled to pay the amount for which the bonds had been pledged, and release the pledgee's lien.

Action by James Roosevelt, as trustee of the estate of William E. Howland, deceased, against the Land & River Improvement Company and others, to recover possession of bonds and mortgages as part of the estate of plaintiff's testator.

Tracy, Boardman & Platt, for plaintiff.

Sullivan & Cromwell, for defendant assignee.

Alfred J. Taylor, for defendant Central Trust Company.

C. E. Miller, for defendant Williams.

L. A. Ward, for defendant Bank of Commerce.

INGRAHAM, J. This case presents several novel and difficult questions, and I have given to it much thought. The main principles to be applied in the disposition of most of the questions presented are, however, well settled, and it is only because of the peculiar circumstances which exist, and the ingenuity with which Weeks endeavored to cover up his frauds, that render the disposition of the questions troublesome.

The defendant the Land & River Improvement Company takes the broad ground that no cause of action is shown, and that the plaintiff is unable to bring his case within a recognized principle of equity. A short statement of the case will, I think, show that all the facts necessary to entitle the plaintiff to relief, under well-settled principles of equity, are present, and that the only difficulty is in determining to just what relief plaintiff is entitled. The plaintiff and Weeks were trustees under the will of William E. Howland, and as such had in their possession, as part of the trust estate, certain securities. Weeks suggested to the plaintiff, his cotrustee, that as these securities were selling at considerable premium, it would be advantageous to dispose of them, and to invest the proceeds in bonds and mortgages. To that the plaintiff assented, and Weeks sold the securities and received the proceeds. Subsequently Weeks proposed to plaintiff to invest the sum of $45,000, a part of the proceeds, in three of these bonds secured by mortgages on property in the city of New York, known as the "Danziger bonds and mortgages," and plaintiff, after an examination of the value of the property, assented. These loans were duly made, and the money paid to Danziger by Weeks; he, however, taking the bonds and mortgages in his own name instead of to himself and the plaintiff as trustees. Subsequently Weeks produced these bonds and mortgages as the property of the trust estate, and showed them to plaintiff, although plaintiff's attention was not called to the fact that they were in Weeks' individual name. These facts are substan-

tially undisputed, and I think show conclusively that these bonds and mortgages became, at that time, securities in which the trust estate was invested.

I do not think it is necessary to consider the question as to the extent to which courts of equity have followed trust funds, where the trustee has appropriated them to his own use, for it is clear that the investment by Weeks of the money of the Howland estate in the three Danziger bonds and mortgages was an express investment of the funds of the Howland estate in these mortgages for the benefit of the trust. When Weeks paid the money to Danziger he had in his possession money belonging to the estate to an amount exceeding the amount of the investment, and, under the agreement between himself and his coexecutor, Mr. Roosevelt, it was understood that the money was to be invested in these specific mortgages as part of the trust estate. Upon his payment of that sum of money to Danziger he appropriated the sum paid to Danziger as an investment of a portion of the Howland trust estate, and the securities in which that money then became invested became a portion of that estate. The fact that the bonds and mortgages were taken in his name individually, instead of in the name of himself and his cotrustee as trustees, could make no difference, as between himself individually and the beneficiaries of the Howland estate. He had in his hands money of the Howland estate to invest. With the consent of his cotrustee, he invested that money in these bonds and mortgages; and the bonds and mortgages when executed became securities in which the trust fund had been invested, and a part of the estate, and a court of equity, at any time, upon the request of any one interested in the estate, would have compelled Weeks to convey those bonds and mortgages to the trustees as part of that estate.

There is no evidence to show that the money of any other estate, or any other trust fund, contributed directly or indirectly in any way to this investment, or that any third party had acquired any interest in these securities. And thus these mortgages in question became, as between Weeks and those interested in the Howland estate, securities of the estate, to which the estate became at once entitled. The assigns of Weeks succeeded to the interest of Weeks at the time of the assignment. It is immaterial, therefore, whether or not the money paid by Weeks to Danziger can be traced directly to any specific moneys that Weeks had received as trustee of the Howland estate. He had money of that estate in his possession, and acting as trustee, with the assent of his cotrustee, he appropriated money in his possession to investments for the benefit of the estate; and, when he had appropriated that money for that purpose, it became then money of the estate, and the securities in which it was invested became the securities of the estate, irrespective of the form in which the money was invested or the persons in whom the legal title to the securities was placed. The only way in which the title of those securities could be divested from the estate would be a transfer by Weeks to a person who acquired an interest in them, without knowledge of the fact that they were securities of

the estate, for a valuable consideration.   The authorities amply sustain this conclusion.

The precise condition was stated by the court of appeals as an example in the case of Van Alen v. Bank, 52 N. Y. 1, as follows:

"My agent collects $100 rent for me, and puts the bills in one pocket, and takes the same amount from another pocket and deposits it, and notifies me. Are my rights gone by the change of the money? I think not. Stripped of unsubstantial forms, the case presented is that of a person delivering stock or bonds to an agent for sale, with directions to deposit the proceeds in a bank to the credit of the agent, but to keep it in that way for him, and the agent follows the directions. Can there be a doubt as to the ownership of the money as between the agent and the principal? Clearly not. Suppose the principal had directed the agent to loan the money on a note or mortgage, would not the security belong to the principal? The bank defendant, upon receiving the deposit, became the debtor ostensibly to the depositor, but equitably to the real owner."

That is just what happened in this case.   Weeks had received the money of his principal, the trust estate.   He had undertaken to invest that money in these specific bonds and mortgages.   He did invest that money, and took back the mortgages as the securities of the investment.   It can make no difference whether that money was the identical bills received by Weeks from the sale of securities of the trust estate in Weeks' hands, or other money of Weeks that he had appropriated as the money of the trust estate, he having received the proceeds of the other securities belonging to the estate, and at the time of the investment having them in his possession.   The same principle was reaffirmed and applied in Baker v. Bank, 100 N. Y. 31, 2 N. E. 452, where the court say:

"Conceding that Wilson & Bro. used the specific proceeds for their own purposes, and their identity was lost, yet when they made up the amounts so used, and deposited them in the trust account, the amounts so deposited were impressed with the trust in favor of the principals, and became substituted for the original proceeds and subject to the same equities."

These four Danziger bonds and mortgages, therefore, being the property of the trust estate held by Weeks as trustee as securities of the estate, it becomes necessary to determine what interest, if any, any other parties have acquired in them.   The fact that these bonds and mortgages were not negotiable securities must not be lost sight of.   They were nonnegotiable choses in action, and it is an elementary principle that a purchaser of a chose in action nonnegotiable takes it subject to the equities between the original parties, and the assignor can give no better title than he himself has. Thus, in the case of Davis v. Bechstein, 69 N. Y. 442, it was held that where a bond and mortgage were given as collateral for the payment of a note of $2,000, which the mortgagee had agreed to have discounted, but which agreement he had failed to perform, and he had subsequently transferred the bond and mortgage to a third party for value, it gave no title to the bond and mortgage. The court said:

"It is very clear that the bond and mortgage in his hands were of no value, and that he could not have enforced them, and the defendant, when he purchased, occupied no better position. Riley could not sell any better title than he had, which was none, and the defendant could not acquire, by the purchase from him, any better title."

Weeks, individually, was not the owner of these bonds and mortgages. He had no power to sell them, and apply the proceeds to his own use, or pledge them as security for engagements or obligations of his own. He had, it is true, wrongfully, in violation of his trust, taken the securities in his own name as an individual, and had thus wrongfully created himself the apparent absolute owner of the bonds and mortgages. But that was done without the knowledge of his cotrustee, and by reason of the power that he had, being the attorney for the trust estate as well as one of the trustees.

There is, however, an exception to the principle stated in the cases before referred to, which is illustrated in the case of McNeil v. Bank, 46 N. Y. 328, and a series of cases that have followed that decision. In that case the rule is stated as follows:

"It must be conceded that, as a general rule applicable to property other than negotiable securities, the vendor or pledgor can convey no greater right or title than he has. But this is a truism, predicable of a simple transfer from one party to another where no other element intervenes. It does not interfere with the well-established principle that where the true owner holds out another, or allows him to appear, as the owner of, or as having full power of disposition over, the property, and innocent third parties are thus led into dealing with such apparent owner, they will be protected. Their rights in such cases do not depend upon the actual title or authority of the party with whom they deal directly, but are derived from the act of the real owner, which precludes him from disputing, as against them, the existence of the title or power which, through negligence or mistaken confidence, he caused or allowed to appear to be vested in the party making the conveyance."

In that case the plaintiff delivered to and left with his brokers a certificate of certain shares of stock, having indorsed thereon a form of assignment, expressed to be made "for value received," and an irrevocable power to make all necessary transfers. The name of the transferee and attorney and the date were left blank. This document was signed by the plaintiff. And it was held that in that case the plaintiff had conferred upon his brokers the apparent ownership of the property, and was estopped from denying such ownership as to third parties, who were thus led into dealing with the apparent owner. And the same principle applies to a bond and mortgage or other nonnegotiable choses in action. In the case of Bush v. Lathrop, 22 N. Y. 537, the question as to the right of a transferee of a bond and mortgage was before the court. In that case the plaintiff was the owner of a bond and mortgage to secure the sum of $1,400. Being indebted to one Preston in the sum of $268.20, he gave him his promissory note for that amount, and assigned the bond and mortgage to him as security for the payment of the note. The assignment was written on the back of the mortgage, expressed a consideration of $268.20, and was absolute in its terms. Preston assigned the bond and mortgage to one Smith by an absolute assignment, and Smith assigned the bond and mortgage to the defendant, who paid therefor the amount due upon the mortgage, without notice of plaintiff's title or interest. The action was brought to compel the defendant to transfer the bond and mortgage to the plaintiff, and the question, as stated by Denio, J., in delivering the opinion of the court, was "whether the right which passed

by the assignment was subject to the equities of Noble's representatives to redeem the mortgage by paying the amount for which it had been pledged to Preston." The court applied the rule that the purchaser takes only the interest which his assignor had to part with, and that the defendant was bound to assign the bond and mortgage to the plaintiff, and account for the money that he had received as interest on the mortgage, upon being paid the amount of the note and interest.

The same question was subsequently presented to the court of appeals in the case of Moore v. Bank, 55 N. Y. 46, and Bush v. Lathrop was overruled so far as it holds that, where the owner of a nonnegotiable chose in action confers upon another an apparent absolute ownership, a person dealing with the apparent owner will be protected, and it was held that there is no distinction between shares of stock and any other nonnegotiable chose in action. Applying the principle established in the case of McNeil v. Bank, supra, to a bond or other obligation for the payment of money, Judge Grover stated the reason of the rule as follows:

"Where one, known to be the owner of shares or chattels, delivers to another the scrip or possession of the chattels, together with an absolute written transfer of all his title thereto, he thereby enables him to hold himself out as owner, and as such obtain credit upon and make sales of the property; and if, after he had so done, the owner was permitted to come in and assert his title against those dealing upon the faith of these appearances, the dishonest might combine and practice the grossest frauds. Another reason is that it presents a proper case for the application of the legal maxim that, where one of two innocent parties must sustain a loss from the fraud of a third, such loss shall fall upon the one, if either, whose act has enabled such fraud to be committed. All these reasons, it is obvious, apply with all their force to choses in action. Why should the owner of a horse or of bank shares, who has given to another an absolute written transfer of all his right thereto for some purpose other than that of passing the title, be precluded, as against a bona fide purchaser from such person, from asserting his title, while, under the same state of facts, he may reclaim from such purchaser a bond and mortgage, or a certificate of indebtedness like the one in question?"

In the case of Greene v. Warnick, 64 N. Y. 224, it was held that while Bush v. Lathrop was overruled by Moore v. Bank, so far as that a bona fide purchaser for value of a nonnegotiable chose in action from one upon whom the owner has, by assignment, conferred the apparent absolute ownership, where the purchase is made upon the faith of such apparent ownership, obtains a valid title as against the real owner, who is estopped from asserting a title in hostility thereto, it was not disturbed so far as it held that the assignee took the instrument, not only subject to all the equities between the parties thereto, but subject, also, to all the equities which a third person could enforce against the assignor, except so far as the assignor was estopped from asserting his title against the bona fide purchaser from one upon whom he had conferred apparent ownership and apparent absolute authority to convey. In that case it was held that in such a case the estoppel can only operate against the party whose act created it, and cannot affect the right or equities of other persons. And in Schafer v. Reilly, 50 N. Y. 61, it was held that one who takes an assignment of a mort-

gage takes it subject, not only to any latent equities that existed in favor of the mortgagor, but also subject to the like equities in favor of third persons; and Bush v. Lathrop, supra, is there cited as a just exposition of the law.

The case of Greene v. Warnick, supra, is instructive upon the question here presented. In that case two mortgages were given upon a piece of property under an agreement between the mortgagees that the said mortgages should be and were equal liens in all respects upon the premises. One mortgage was recorded 15 minutes ahead of the other mortgage. The mortgagee of the first recorded mortgage, for a valuable consideration, assigned and transferred to the defendant the mortgage in question, who received it without knowledge of the agreement between the mortgagees, and relying upon the fact that it was first recorded, and therefore that he was entitled to a preference over the other mortgagee. The court held that the recording act did not give to the holder of the mortgage first recorded the right to a preference, and that the assignee of the mortgage took it subject to the agreement between the mortgagees.

The rule is thus established, that when one takes an assignment of a mortgage he takes it subject to all equities that existed in favor of the mortgagor or in favor of third persons, unless the person seeking to enforce the equity has been estopped from asserting his title against a bona fide purchaser for value, without notice.

We now come to the question as to whether any facts have been proved that estopped this plaintiff, as trustee of the beneficiaries under the Howland will, from asserting the title of the Howland estate to the bonds and mortgages in question. The first question is presented by the claim of the defendant Williams, to whom Weeks assigned these bonds and mortgages as collateral security for the loan of certain railroad bonds borrowed for the purpose of raising money for the defendant the Land & River Improvement Company, a corporation of which Weeks was president, and of which Williams was director. It is quite important to keep distinctly before us the fact that these bonds and mortgages were the property of the estate, in which the money of the estate had been invested, the title to which had been taken by Weeks in his own name wrongfully, and without the knowledge of his cotrustee or of the beneficiaries. Weeks, thus holding these mortgages as trustee, went to Williams, and Williams testifies as to the conversation as follows:

"He stated that the Land & River Improvement Company required some money for the immediate wants of the company. He said that he had no bankable collaterals, but had some good mortgages, which he was willing to give to me, provided I would loan bankable collaterals. He said he wanted it probably ninety days or less. I, in that conversation, agreed with him to furnish those certain securities, receiving from him as collateral the mortgages that he had designated to me as the three Danziger mortgages on property in New York City, in Seventy-first street, somewheres east of Second avenue. He went to his office, and drew assignments of the mortgages, and returned to my office. In the meantime I had obtained these securities. He returned the same day, and brought in these assignments. He handed the bonds and mortgages and assignments to me."

Williams then delivered the bonds to Weeks, and received from Weeks the three bonds and mortgages, with assignments to Williams, executed by Weeks, and at the same time Weeks executed and delivered to Williams the following receipt:

"Northern Pacific Railroad Company, General Office, 35 Wall St.
"James B. Williams, Vice President.
"New York, Dec. 12, 1892.

"Received from James B. Williams, as a loan, thirty thousand dollars of the consolidated five per cent. mortgage bonds of the Northern Pacific R. R. Co., Nos. 18,707 to 18,733, inclusive, and 18,735 to 18,737, inclusive, and also eighteen thousand dollars Northern Pacific & Montana R. R. Co. first mortgage bonds, Nos. 4,967 to 4,974, inclusive, and 4,989, inclusive. Said bonds to be returned to said Williams within ninety days from date, and as collateral security for said loans three bonds and mortgages for fifteen thousand dollars each, made by Max Danziger to Francis H. Weeks, all dated November 2, 1895, have been assigned by said Francis H. Weeks to said Williams.

"Land & River Improvement Co.,
"[Seal of the Company.]                    By F. H. Weeks, Pres't."

Weeks subsequently used bonds obtained from Williams as security for a loan from the defendant (the Bank of Commerce) of $30,000, which was paid by Weeks to the company, $5,000 of which was subsequently repaid to the bank by Weeks. The remaining $25,000 is still unpaid and due from Weeks to the bank, the bank holding as collateral security for that loan the bonds received by Weeks from Williams. The evidence is that those bonds have so depreciated in value that they are worth much less than the amount due upon the loan. The contract made between Weeks and Williams was not a contract that Weeks made individually, and as between himself and Williams the bonds delivered by Williams were not delivered to Weeks individually, but were delivered to the Land & River Improvement Company. It was the Land & River Improvement Company that received the bonds, and it was the Land & River Improvement Company that agreed to return the bonds to Williams within 90 days from the date of the agreement. In that agreement was recited the fact that Weeks individually had assigned to Williams these three bonds and mortgages as collateral security for the performance by the Land & River Improvement Company of its agreement to return the bonds borrowed for Williams within 90 days.

I have come to the conclusion that the Howland estate is estopped from claiming these bonds and mortgages as against the rights of Williams. Weeks and the plaintiff were the trustees of the Howland estate, representing the estate, and the only ones that could act for it. By the express act of one trustee, without objection from the other, the apparent title to those bonds and mortgages had been vested in Weeks individually, giving to him the apparent absolute ownership of the bonds and mortgages. The fact that the plaintiff did not know that Weeks had obtained the apparent legal title to these bonds and mortgages was occasioned by his own neglect in failing to make a proper examination, he trusting entirely in the integrity of his cotrustee. But, certainly, the fact of such neglect cannot take from Williams the rights that

he has acquired in consequence of the apparent ownership with which such neglect allowed Weeks to clothe himself. It is clear that Williams delivered his bonds to the Land & River Improvement Company on the faith of his right to hold these three bonds and mortgages as collateral security for the return of the bonds, and I think he is entitled to hold the bonds and mortgages as collateral security for the compliance by the Land & River Improvement Company with its agreement with him for the return of the bonds. Williams' agreement with Weeks, however, did not vest in him the ownership of the bonds and mortgages. The legal title to them was transferred to Williams, and he held them as collateral security for the performance of the agreement of the Land & River Improvement Company to return the bonds. The equitable title, however, was in the Howland estate; and in this action the bonds and mortgages are the property of the Howland estate, subject to the right of Williams to hold the same as security for the performance by the Land & River Improvement Company of its contract. These bonds and mortgages thus being the property of the trust estate, having been fraudulently diverted by one of its trustees, a court of equity has jurisdiction to follow the trust property in the hands of any person to whom it shall come, and to recover it for the estate, and require those persons whose duty it is to deliver it to the trustees for the benefit of the trust estate to so deliver it; and that is the judgment that the plaintiff asks here, and it is that judgment to which I think the plaintiff is entitled.

The question is then presented as to how these bonds and mortgages are to be obtained for the trust estate. As before stated, Weeks, in his contract with Williams, was not acting in his individual capacity. He applied to Williams, as president of the Land & River Improvement Company, to obtain for that company securities upon which he could borrow money for the benefit of the company. It was the company that borrowed from Williams these securities, and it is as security for the compliance by the company with its contract to return the securities that Williams holds these bonds and mortgages. It is the company that has failed in its agreement with Williams, and it is the company, therefore, that has converted these bonds to its own use. We are not concerned with the dispute between Weeks and the company; nor is it material that Weeks has robbed the company of the amount of its loan. As between the plaintiff, Williams, and the company, it is the company that is in default on its agreement to return the bonds and mortgages; and the only way by which the plaintiff can recover its bonds and mortgages is for the company to make good its default to Williams, and so release the securities that Williams held as collateral for the performance by the company of its obligation to Williams. It was thus the company that appropriated the plaintiff's bonds to its own use, and while Weeks committed the fraud upon the estate of which he was trustee, in delivering the bonds to Williams, as between the estate and the company I can see no reason why the estate is not entitled to hold the company liable for its proportion of the property of the estate which

it had converted to its own use; and I can see no reason why the court has not power in this action, with all the parties before it, to direct such a judgment as will restore to the plaintiff its security by compelling the party in default to so perform its contract as to release the bonds and mortgages from the lien of Williams to which he was entitled under the agreement between himself and the company. The plaintiff has nothing to do with the defendant the Bank of Commerce, nor is the Bank of Commerce entitled in this action to recover the amount of its loan from any one. Williams having demanded his securities from Weeks after the expiration of 90 days, and Weeks having failed to return them, Williams was entitled to the damages that he sustained because of the failure of Weeks or the corporation to fulfill its agreement; and there is no obligation on his part to receive these bonds, their value having greatly depreciated, as a compliance with the covenant of the company to return them at the expiration of the 90 days from the date of the agreement.

I do not understand in this action that Williams has served a copy of his answer upon the defendant the Land & River Improvement Company, or that he demands judgment for the full amount of his claim against that company. All that this judgment can require is that the Land & River Improvement Company pay to Williams a sum sufficient to release these bonds and mortgages, the property of the plaintiff. The exact value of these bonds and mortgages has now been ascertained by the mortgagors having paid into court the amount due upon the mortgages, so that, upon the payment by the Land & River Improvement Company to Williams of the amount that has been paid into court, Williams' right to these bonds and mortgages will end, and the amount in court, standing in place of the bonds and mortgages, which are the property of the plaintiff, will then belong to plaintiff, and can be paid over to him.

It is hardly necessary to discuss the claims of the three other defendants who claim these Danziger bonds and mortgages. It is sufficient to say that in neither instance did the facts appear that would justify me in finding that the plaintiff was estopped from claiming that the estate of which he is trustee is the owner of these bonds and mortgages. No money of either of these estates has been proved to have been applied to the purchase of these bonds and mortgages, nor did either of the estates become bona fide holders for value of them. The most that can be said is that Weeks represented to the beneficiaries that he had invested the property of the estate in these securities, and that they relied upon his representation. These representations were false, and were known by Weeks to be false when he made them, and no estoppel can arise in favor of one estate against another because of a representation made which the legal representatives of both estates knew to be false at the time it was made. I think there should be judgment directing the defendant the Land & River Improvement Company to pay to Williams the amount of the Danziger bonds and mortgages that have been paid into court, and that, upon this payment

being made to Williams, then the money now in court, being the proceeds of the Danziger bonds and mortgages, be paid over to plaintiff, the plaintiff and Williams each to have costs against the Land & River Improvement Company. The Bank of Commerce was made a party defendant as the holder of the bonds delivered by Williams to the Land & River Improvement Company, but, as judgment is neither asked for nor granted against it, the complaint can be dismissed as to the bank, with costs to be paid out of the fund in court. Ordered accordingly.