(29 App. Div. 101.)

### MERCHANTS' BANK OF BUFFALO v. WEILL et al.

(Supreme Court, Appellate Division, Fourth Department.   May 7, 1898.)

BOND FOR PAYMENT OF MONEY — DEFEASANCE AGREEMENT — INNOCENT PURCHASER—ESTOPPEL.

The original parties to a bond secured by a mortgage entered into an optional executory contract of defeasance providing that at any time the obligor might, by conveyance of the property, rescind the purchase, and reconvey the premises, which reconveyance should discharge the bond and mortgage.   The bond and mortgage were thereafter assigned in good faith for value, without any notice to the assignee of the defeasance, and the obligor, after the assignment and before the option was exercised, made a payment thereon.   *Held*, that such option could not be exercised as against the assignee.

Green, J., dissenting.

Appeal from special term, Erie county.

Action by the Merchants' Bank of Buffalo against Louis Weill, impleaded with others.   From a judgment in favor of defendant Weill, the plaintiff appeals.   Reversed.

This action was begun June 18, 1896, to foreclose a bond and mortgage, and to recover a judgment for a deficiency against the obligor on the bond in case any should arise upon a sale of the premises.   November 5, 1890, George L. Thorne and Byron P. Angell were partners, under the firm name of Thorne & Angell.   The firm owned a piece of land fronting on the north side of Forest avenue, in the city of Buffalo, which land is 370 feet long on the street, and 252 feet deep, the legal title to which was vested in Byron P. Angell, who held it for the benefit of the firm.   On that date (November 5, 1890), Byron P. Angell conveyed the land to Louis Weill.   The conveyance is not in evidence, but it is assumed to be an ordinary warranty deed.   Weill testified that the consideration of the conveyance was $8,302, of which sum $2,302 were paid down; and on the same day (November 5, 1890) Louis Weill executed his bond to Byron P. Angell, by which he bound himself to pay to the obligee, or to his representatives or assigns, $6,000 in five equal annual payments, with semiannual interest on the 1st days of May and November in each year; and, as collateral thereto, the obligor executed a mortgage to Byron P. Angell on the premises so conveyed, to secure the payment of the bond, in which mortgage it is recited that it is given to secure the payment of part of the purchase price of the mortgaged premises.   This mortgage was acknowledged November 29, 1890, and on the same day was duly recorded in the office of the clerk of the county of Erie.   January 23, 1891, Byron P. Angell, the mortgagee, assigned his bond and mortgage to the plaintiff as collateral security for the payment of the notes held by the bank, made or indorsed by Thorne & Angell, and as a continuing security for all the obligations of Thorne & Angell thereafter to be held by the plaintiff.   This assignment was duly recorded in the office of said clerk February 3, 1891.   The cashier of the bank testified that, within a month or two after the assignment, he wrote Louis Weill, informing him of the assignment.   Louis

Weill was called as a witness in his own behalf, and did not deny the receipt of the letter, but testified: "I had paid the interest just once before, on the mortgage at the Merchants' Bank, in May, 1891, and I was informed in some way that the Merchants' Bank held this mortgage and bond." May 1, 1891, a representative of Louis Weill, accompanied by a clerk of Thorne & Angell, called at the bank, and Weill's representative then paid $176, interest then due on the bond, which the cashier indorsed thereon. April 30, 1892, Louis Weill and his wife duly executed, acknowledged, and delivered a deed of the mortgaged premises to George L. Thorne and Byron P. Angell, which was recorded in the office of said clerk June 7, 1892. The plaintiff began an action to foreclose this mortgage, and asked for a personal judgment against Louis Weill on his bond for the deficiency, if any should arise. Louis Weill answered, setting up the defense that, when the bond and mortgage were executed, it was agreed between himself, as mortgagor, and Thorne & Angell, that the mortgagor might at any time within two years from the date of the bond and mortgage elect to rescind the purchase, and convey the premises to Thorne & Angell, which should discharge the bond and mortgage, and that by his deed to Thorne & Angell of April 30, 1892, the bond was discharged. When the assignment was executed to the bank, it held commercial paper made and indorsed by Thorne & Angell; and, when this action was begun, they were indebted to the bank in the sum of $15,343.69 on commercial paper, all of which was dated after the assignment of the bond and mortgage, and much of it was for loans made after the assignment. The trial court held that the amount unpaid on the bond and mortgage was an equitable lien upon the land in the hands of Thorne & Angell, who had received the conveyance from Louis Weill, but held that the executory agreement between Louis Weill and Thorne & Angell, and its execution subsequent to the assignment of the bond and mortgage to the plaintiff, was a valid discharge of the bond of Louis Weill, and that he could not be held liable thereon for the deficiency, if any. From this judgment, the plaintiff appeals.

Argued before HARDIN, P. J., and FOLLETT, ADAMS, GREEN, and WARD, JJ.

George J. Sicard, for appellant.
Simon Fleischmann, for respondents.

FOLLETT, J. The defendant rests his defense on Lord Thurlow's rule:

"A purchaser of a chose in action must always abide by the case of the person from whom he buys. That I take to be a universal rule." Davies v. Austen, 1 Ves. Jr. 247.

This rule was declared more than 100 years ago, when an assignment of a chose in action did not transfer the legal title to it; and actions to enforce all kinds of choses in action, except certain bills of exchange and promissory notes, were necessarily brought in the name of the original promisee, which continued to be the law of this state until 1848.

The doctrine laid down in Davies v. Austen, supra, and kindred cases, was a corollary of the rule of the common law as laid down by Lord Coke in Lampet's Case, 10 Coke, 46b, 48a:

"The great wisdom and policy of the sages and founders of our law have provided that no possibility, right, title, nor thing in action shall be granted or assigned to strangers; for that would be the occasion of multiplying of contentions and suits, of great oppression of the people, and the subversion of the due and equal execution of justice."

This was the wisdom of those days, but it is not wisdom in these days. From time to time, many choses in action which are transfer-

able by delivery or by assignment have been taken out of the rule for the encouragement of trade and commerce.    Bills of lading, bonds of corporations, under seal, and other securities for the payment of money too numerous to mention, have been released from this rule. The rule is no longer applicable when the question of title arises to instruments within the recording acts.    When the rule was declared, bonds and mortgages and most of the obligations now in common use were unknown, and recording acts had no existence.    The origin and development of the rule were largely due to the fact that assignments of choses in action were discouraged, and, when assigned, actions to enforce them had to be brought in the name of the original promisee. Now, and for some years, actions have been maintainable in the name of the transferee, and assignments of choses in action are encouraged; and the rule, instead of being extended, has been restricted, and many exceptions created.    However, the rule relates to defenses arising out of matters inherent in the contract, by which the chose in action is evidenced, and existing before it is assigned; and especially is this true of bonds by which the obligors undertake unconditionally to pay definite sums of money, at stated periods.    Snell, Eq. (9 Eng. Ed.) 89 et seq.; 2 Pom. Eq. Jur. § 704.    The cases of which Bush v. Lathrop, 22 N. Y. 535, Union College v. Wheeler, 61 N. Y. 112, Green v. Warnick, 64 N. Y. 220, Crane v. Turner, 67 N. Y. 439, and Frear v. Sweet, 118 N. Y. 462, 23 N. E. 910, are types, are not in point, because the facts and questions involved are entirely unlike the facts and questions in the case at bar.

So far as I know, the rule has never been extended far enough to cover the case at bar, and so as to authorize the original parties to a bond to defeat it, under an optional executory defeasance contained in a secret collateral contract, after the bond had been assigned, in good faith and for value; the assignment being known to the obligor and obligee before the option was exercised, the parties to the bond not having disclosed to the assignee the existence of the defeasance, but allowed the assignee to make advances thereon upon the faith that it was a valid bond, and the obligor having made a payment to the assignee after the assignment, and before the exercise of the option.    The defenses available under Davies v. Austen, supra, and under the cases in the court of appeals following it, must be actually, instead of potentially, in existence when the chose in action is assigned; and a defense not in existence when the assignment is made cannot thereafter be created or brought into existence through the failure of the obligee afterwards to perform a collateral agreement with the obligor, nor through the execution of a secret, executory contract of defeasance.

In Bush v. Cushman, 27 N. J. Eq. 131, the defendant executed a mortgage to Ellis & Co. to secure the payment of $5,000, which was assigned to the plaintiff.    An action was brought to foreclose the bond and mortgage, which was defended by the mortgagor on the ground, which was proved, that the mortgagee, at the time the mortgage was executed, agreed to advance to the mortgagor $15,000, of which $5,000 was part, the other $10,000 to be secured on other lands, and also agreed to purchase the hides and tallow owned by the mort-

gagor at fixed prices. The mortgagee, subsequently to the assignment of the mortgage, refused to make further advances, and refused to purchase the hides and tallow. It was held that this constituted no defense to the mortgage. It was said:

"Unquestionably, the assignee of a mortgage or any other chose in action takes it subject to all equities and defenses existing between the original parties at the time of the assignment; but I do not understand that this rule embraces equities or defenses springing from defaults, or even fraud of the assignor, committed subsequent to the assignment, and which had no existence and were simply possibilities at the time of the assignment. The rule excludes defenses and rights accruing after the assignment."

In Coster v. Griswold, 4 Edw. Ch. 364, it was held:

"Where an assignee takes in good faith, his right to hold will not be disturbed or devested by any subsequent event or after-accruing right or equity of the debtor. Chance v. Isaacs, 5 Paige, 592. All that a court of law or equity can do in such cases, since they recognize and protect the rights of assignees of choses in action, is to allow them to take, subject always to any defense, legal or equitable, which existed in favor of the debtor against the original holder or creditor at the time of the transfer or assignment." 1 Jones, Mortg. § 847.

Suppose a secret executory contract had existed between the mortgagor and a mortgagee, by which the latter agreed, on the receipt of one dollar from the mortgagor, within two years from the date of the instruments, to cancel them. Such an agreement would not, I think, be available against an assignee for value and without notice. The case at bar is not different. It cannot be that in case A. gives his bond to pay B. $1,000 two years from date, with interest, and B. transfers it to an assignee for value, with notice to A., who remains silent, afterwards B. can, by virtue of a secret executory agreement made with the obligor at the date of the bond, discharge it. This is exactly what was attempted to be done in the case at bar. If the parties to this bond and mortgage had power to bring into life as against the assignee the defense interposed, they could defeat a bond or a mortgage in the manner supposed. There is no question of notice or inquiry in this case. The agreement on which the defense is rested is not such a one as a purchaser of a bond is bound to anticipate as possible, or to inquire about; nor is it such a probable defense as a purchaser is deemed to have notice of, or is deemed to have purchased subject to, under Lord Thurlow's rule. To establish the rule contended for by the respondent will open a wide door for the entrance of countless frauds, and render bonds and mortgages unassignable, with safety to the purchaser, unless he secures a statement from the mortgagor, the subsequent grantees of the mortgaged premises, and of all previous holders of the bond and mortgage, that there is no defense then existing against them arising out of, or which may arise out of, secret collateral agreements. If the agreement in this case is good against the bank, a like agreement between an assignee of a bond and mortgage and the mortgagor, or with a subsequent owner of the mortgaged premises, would be valid as against a subsequent assignee, in good faith and for value. Such an inconvenient and dangerous rule ought not to be sanctioned, and I find no authority for it in any case or in any text-

book.    A bond for the payment of money at future periods, contain-
ing no provision for its rescission, cannot, after it has been assigned
with the assent of the obligor and the obligee to a third party, in.
good faith and for value, be rescinded by the joint action of the-
obligor and obligee, pursuant to an undisclosed parol agreement ex-
isting between them, and entered into when the bond was given, or-
at any time subsequent to its date, and before the assignment.
Again, as before stated, Louis Weill, knowing that the bond and
mortgage had been assigned to the bank, paid the first six months'
interest due on the bond to the bank, without giving it notice of his
alleged secret agreement with the mortgagee.    Then good faith called.
on him to speak and disclose the fact that the bond and mortgage
was subject to be destroyed at his option, at any time within two years
from its date.    He remained silent, and, by his silence, lulled the-
bank into supposed security, and encouraged it to make further ad-
vances on the bond and mortgage, which it did; and Weill is now es-
topped from asserting the existence of, and attempting to enforce as-
against the bank, his undisclosed collateral executory contract with
Thorne & Angell.

The judgment should be reversed, and a new trial ordered, with
costs to the appellant to abide the event.    All concur, except GREEN,
J., dissenting.

_____

In November, 1890, Messrs. Thorne & Angell, of Buffalo, conveyed to the
defendant Weill certain premises, situate in said city; and, at the same
time the bond and mortgage described in the complaint were executed and de-
livered by Weill to Thorne & Angell.    Contemporaneously with the giving of
this deed, bond, and mortgage, a further written agreement was made be-
tween Thorne & Angell and defendant Weill, whereby it was agreed that
should Weill, at any time within two years from its date, decide so to do,.
he could rescind the transaction, and redeed the property to Thorne & Angell,
who agreed to thereupon pay to him all moneys he had paid them, with.
interest, and all other moneys paid out by him for taxes on the property
in question; that thereupon Weill should be released from all responsibility
and liability under the bond and mortgage, and should not be liable under
the same after such reconveyance; and that he should be reimbursed and,
reinstated in his original position.    Those three instruments were made-
and executed in November, 1890.    In January following that date, Thorne &-
Angell assigned the bond and mortgage which is the subject of this litiga-
tion to the plaintiff bank, as a further continuing collateral to other collateral
which the bank held for the general debts of Thorne & Angell to the bank.
Within the time specified in the agreement between Weill and Thorne & Angell,
the defendant Weill availed himself of his right to rescind, and in May, 1892,
deeded back the property, was paid the money he had disbursed in the
transaction, and was thus reinstated in his original position, pursuant to his-
agreement.    The bank continues to be the owner and holder of the bond and
mortgage.    Upon default in some of the payments therein agreed to be paid,.
it brought this action for the foreclosure of the mortgage, and for a de-
ficiency judgment against the defendant Weill, if, upon a sale of the premises,
sufficient was not realized to pay the amount of the bond and mortgage.

GREEN, J. (dissenting).    The facts in this case are undisputed, nor-
is the general proposition that the assignee of a bond and mortgage-
takes them subject to the equities existing between the parties there-
to in any manner controverted by the appellant, but its contention,
is that this general rule is not applicable to the present case.

The first argument advanced by appellant in support of its conten-tion is, that the contract, in effect, provided that there should be no payment upon the bond and mortgage, unless the obligor and mort-gagor so elected, and therefore was a defeasance and impeachment of their terms, and in direct contradiction thereof; that the contract was secret, and the existence thereof concealed from the plaintiff; that such a contract is in itself subversive of all equity; and that the promoter of such a contract should not be protected as against an in-nocent holder of the mortgage security.

An examination of the cases bearing upon this question discloses the fact that a condition analogous to the one here presented exists in each of those cases. The contracts and agreements of the parties therein were secret, and were not disclosed to the purchaser of the security. If they had not been secret and undisclosed to the one dealing with the securities, if they had been included and expressed in the securities themselves, then the question which did arise in those cases would necessarily never have arisen, because in such cases the purchasers would have had full notice from the terms of the securities themselves. In those cases, too, the purchasers were bona fide purchasers. They took without notice of the latent equities existing between the original parties to the transactions. It is true that this plaintiff was not apprised of the contract in question when it was executed, for the reason that there was no intention on the part of either of the parties to that contract that the bond and mort-gage in question should be assigned to this plaintiff. It was a con-tract which, under the established rule of law governing parties to contracts, they had a right to make. It was not incumbent upon Weill to inform any person that such a contract was in existence. It was, however, incumbent upon this plaintiff, dealing with these nonnegotiable instruments, to make inquiry of the one who was bound thereby, concerning any latent equities that might exist in his favor against the enforcement thereof. If this bank, when it took the assignment of the bond and mortgage as collateral and continuing security for the debts of Thorne & Angell, had performed its duty in respect thereto, it would have been protected against such con-tract, and the equity now claimed by the defendant Weill. The bank, upon such inquiry, would have ascertained the existence of the con-tract; or if, upon inquiry, defendant Weill had denied its existence, or disclaimed having any defense to the obligations, the bank would have been protected. The defendant Weill would have been estopped from relying upon the contract. Kirby v. Fitzgerald, 31 N. Y. 425; Reeves v. Kimball, 40 N. Y. 311, 312. The bank, however, made no inquiry of the defendant Weill. There was nothing to show that, from the time of the making of the bond and mortgage to the time of the trial, any officer of the bank ever made inquiry of Weill, or that Weill had seen any officer of the bank relative to the bond and mortgage, or to his obligation thereunder. The only evidence of any attempt on the part of the bank to even give notification to the defendant Weill that the bank had become the owner of the bond and mortgage is found in the testimony of the cashier of the plaintiff, who testified:

"Some time after the assignment of this mortgage to the bank, I notified the defendant Mr. Louis Weill that such assignment had been made. I cannot tell you the date, or how long it was after the assignment was made. I have no copy of the letter. The notice, however, was by letter to Mr. Weill, written by me; and it was a few days—certainly within a month or two—after the transfer was made." "I have no letter file of that letter sent to Mr. Weill. I did not look for such a letter."

The appellant, however, claims that the payment of interest which became due by the terms of the bond and mortgage in May, 1891, shows that Weill then knew of the transfer to the bank. It appears that, when the payment of interest became due, Weill sent a clerk to pay the same; that the clerk went to Thorne & Angell's office to make such payment; and that Weill's clerk, with a clerk from Thorne & Angell's, went to the bank of the plaintiff. This is the evidence of the plaintiff's cashier respecting what took place at that time:

"The first payment of interest that was made upon this bond and mortgage was made to me, and in the presence of a representative of Mr. Weill, who came down with Thorne & Angell's clerk; and I indorsed it on the bond. The payment was made May 1, 1891. The indorsement which shows here on the bond is respecting that payment, and is in my handwriting, and was written by me at the time the payment was made. The bank did not receive the money. The money went to Thorne & Angell."

This is the only evidence concerning that payment, and the only evidence of any transaction between Weill and this bank respecting the bond and mortgage. The payment referred to was the only one ever made upon the bond and mortgage by Weill or any one, although other payments thereon became due previously to the commencement of this foreclosure action. It appears, therefore, that the only payment on the bond and mortgage was made, not to the bank as the owner and holder of the bond and mortgage, but, with the consent of the bank, to Thorne & Angell. So, it would seem, the bank itself considered Thorne & Angell entitled to the payment thereunder. This, coupled with the fact that the bank made no inquiry of Weill preceding the assignment of the bond and mortgage to it, tends very strongly to show that the bank did not, in taking the bond and mortgage, rely upon the personal liability of Weill, but considered them as merely an incidental collateral, in connection with other collaterals which the bank held for the general debts of Thorne & Angell to the bank.

It does appear from the testimony of Weill that, at the time of the final transaction with Thorne & Angell, he had been informed in some way that the bank held this bond and mortgage. He did know that, when the interest was paid, the bond and mortgage were at the bank, and he knew, also, that the money then paid thereon was credited to Thorne & Angell, and not to the bank. It is not claimed that Weill ever had any notice of the assignment until long after it was made. Weill never was informed of the conditions or terms under which the assignment was made to the bank, nor did he know that the bank ever made any advancements to Thorne & Angell upon the faith of such securities. If the duty to inform the bank of the collateral agreement rested upon any one, it was upon Thorne & Angell; and Weill may have well inferred that, when Thorne & Angell made the transfer to the bank, they

informed it of the collateral agreement, and that the bank held the bond and mortgage subject to such agreement. However that may be, I am of the opinion that Weill's equity was preserved to him by this collateral agreement, valid between the original parties to the transaction, and that the bank took only the title which the mortgagee could, by assignment, give; and that was the title to a bond and mortgage, subject to the existing equity and rights of the maker. Brewing Co. v. Iba, 155 N. Y. 224, 49 N. E. 677. The bank took the bond and mortgage for what it was worth, and without inquiry of Weill; and his communication after that to the bank as to his rights under the collateral agreement could in no way have helped the bank; and his silence in no way prejudiced the bank as to the transaction between it and Thorne & Angell, which had been consummated long before Weill knew of it.

In further support of his contention, the appellant asserts that the so-called "equities" of the defendant Weill are not inherent in the bond and mortgage transferred to the plaintiff. It has been shown that the deed, bond, and mortgage and contract were contemporaneous. The contract in question was a part of the original transaction itself. The premises were purchased, the deed accepted, and the bond and mortgage given, upon the conditions expressed in the contract in question. It may fairly be assumed that neither the deed nor the bond and mortgage would have been executed except upon the conditions expressed in the contemporaneous agreement. This was made the basis of the sale and purchase of the premises, and was the incentive to and condition of executing the bond and mortgage in question. It cannot be separated from these instruments. It is a part of them. Thorne & Angell could not have separated this contract from the bond and mortgage had they attempted to enforce the latter. During the life of the contract, it would have been a complete defense in the hands of this defendant against the mortgagees and obligees in the bond and mortgage. Thorne & Angell could not, by making an assignment during the life of that contract, vest their assignee with, nor confer upon it, a better title than they themselves had; but the assignee of the bond and mortgage took them subject to all the equities existing between the original parties thereto.

The appellant further insists that the equities are clearly with the bank in the transaction under consideration. The bank is seeking to enforce the obligation against Weill. There is no evidence of fraud nor deceit nor of an intention to deceive any one in the inception and execution of this contract. The bond and mortgage were not given with a view of obtaining a loan or credit from this or any other bank, nor of being used as collateral security for the indebtedness of Thorne & Angell to this bank. No fraud nor deception was intended or practiced. The parties had a right to make this contract. It was a contract authorized by the law, and the parties thereto had a right to contract with reference to the existing law, and to rely upon the same in the enforcement of the terms and conditions of the contract. There is nothing to show that the defendant Weill was unwilling, at any and all times, if

called upon, to disclose the terms of that agreement. He certainly could not have been required to voluntarily go to this plaintiff, and inform it of his agreement with Thorne & Angell. Before the assignment of the bond and mortgage to plaintiff, he had no knowledge of any transactions or dealings between the bank and Thorne & Angell, nor that the bank contemplated taking these obligations as collateral securities to the indebtedness of Thorne & Angell. The obligation and duty rested upon the bank, when it contemplated dealing with these nonnegotiable instruments, to make inquiry of Weill, and ascertain whether he claimed any defense thereto. Reeves v. Kimball and Kirby v. Fitzgerald, ante. The inquiry, to have been effective, should have been made preceding the taking of the assignment. The plaintiff does not pretend that it gave any notice, by letter or otherwise, of its intention to take an assignment of the bond and mortgage. The only notification it ever gave to Weill was after the assignment had been executed and delivered to it, and then only in the manner disclosed by the evidence of the cashier of the plaintiff, to which I have heretofore called attention. It would seem that it is the bank that has been negligent, and that it has failed to take the ordinary and customary mode for its protection.

Another reason assigned by the appellant as precluding the defendant from asserting his equity as a defense to this action is that when the defendant Weill reconveyed the property to Thorne & Angell, under the contract in question, and received back the cash payment, he then knew that the bond and mortgage were held by the bank, and that his surrender of the property should have been made to the assignee, instead of the mortgagee, or should have included both, and that he should then have applied to the bank for the discharge of the bond and mortgage. The election of Weill to rescind was within the time provided by the contract. Thorne & Angell recognized the conditions and covenants of that contract and did the only thing possible to fulfill the terms of the same, and that was repayment of the money to Mr. Weill upon his demand, and upon the reconveyance of the land to them, and assumption of the bond and mortgage by them, pursuant to their agreement that defendant Weill should be relieved from all liability thereunder, and reinstated in his original position. At the time of the latter transaction, it appears, the bond and mortgage had been assigned to the bank; and therefore it was impossible for the original contractors, Thorne & Angell, to cancel or surrender the same at the time of this reconveyance of the land. The bank was in no wise a party to this transaction, nor were its rights affected or changed thereby. Its lien upon the land under the mortgage held by it remained undisturbed, and has been protected by the judgment herein, directing an enforcement thereof, by a sale of the mortgaged premises. The bank was not a party to the original contract, neither was it a party to the transaction by which the terms of the contract were fulfilled. No consideration passed to Weill from the bank, or from Thorne & Angell, constituting any agreement or claim against Weill which should inure to the benefit of the bank. Thorne & Angell recognized

as a valid and subsisting claim the contract made with Weill, and
fulfilled the covenants and conditions therein contained to be per-
formed by them.    Of this the bank could not complain; for, in tak-
ing the bond and mortgage, it took the same subject to this con-
tract, and subject to all the defenses, legal and equitable, which the
mortgagor had against the enforcement of it by the assignor at the
time of the assignment.    Hill v. Hoole, 116 N. Y. 302, 22 N. E.
547;  Bennett v. Bates, 94 N. Y. 354, 363;  Brewing Co. v. Iba, 155
N. Y. 224, 49 N. E. 677.

"The principle is settled beyond peradventure that the assignee
of the mortgagee must take it subject to the equities attending the
original transaction.    If the mortgagee cannot enforce it, then the
assignee has no greater rights.    The true test is to inquire, what
can the mortgagee do by way of enforcement of it against the prop-
erty mortgaged?    And what he can do the assignee can do, and no
more.    As a purchaser of a chose in action, he must always abide
the case of the person from whom he buys, and he stands entirely
in the place of the latter."    Crane v. Turner, 67 N. Y. 439, 440;
Gray v. Green, 77 N. Y. 619.    "And the rule is too well-settled to
require amplification of the reasons upon which such rule is founded
that an assignee of a mortgage takes it subject to the equities of the
original parties to it.    The assignee steps into the place, in that
respect, of the mortgagee."    Frear v. Sweet, 118 N. Y. 462, 23 N. E.
910;  Owen v. Evans, 134 N. Y. 514, 31 N. E. 999;  Rapps v. Gottlieb,
142 N. Y. 164, 36 N. E. 1052;  Fairbanks v. Sargent, 104 N. Y. 116,
117, 9 N. E. 870;  Ingraham v. Disborough, 47 N. Y. 423; Schafer v.
Reilly, 50 N. Y. 67.

Many of the cases bearing upon this question have been collated
and commented upon in a recent case,—Roosevelt v. Improvement
Co., 11 Misc. Rep. 604, 33 N. Y. Supp. 536; and the conclusion from
such review and discussion is thus expressed:

"The rule is thus established that, when one takes an assignment of a
mortgage, he takes it subject to all equities that exist in favor of the mort-
gagor, or in favor of third persons, unless the person seeking to enforce the
equity has been estopped from asserting his title against the bona fide pur-
chaser for value without notice."

The appellant, while conceding that the rule is thus established
by the cases cited, still insists that there are exceptions to the rule,
and that those exceptions are as firmly established as the rule itself;
and its chief reliance for such contention is McNeil v. Bank, 46 N.
Y. 325;  Moore v. Bank, 55 N. Y. 41, and Fairbanks v. Sargent, supra.
In the case last cited, the learned court reasserts the rule in these
words:

"It is undoubtedly the general rule that the assignee of a chose in action
takes it subject to all the equities existing against it in the hands of the as-
signor, and can acquire no greater right or interest therein than belongs to
his transferror."

This is asserted without qualification or modification.    In the
course of the opinion, however, the court, in referring to the case
of Bush v. Lathrop, 22 N. Y. 535, uses this language:

"Bush v. Lathrop has been criticised in subsequent cases, and so far modified
as to exclude from the operation of the principles there laid down the case

of a purchase in good faith of a nonnegotiable instrument from an assignee·
of the real owner, upon whom he has by assignment conferred the apparent.
absolute ownership, when such purchase has been made in reliance upon the·
title apparently acquired by such assignee."

It will be readily observed that this modification has no reference·
to such a case as the one under review, but deals with the question
raised against the real owner of the chose in action, and one who
has derived title from the assignee of the owner, and rests upon the·
ground of estoppel as against the real owner of the chose in action,
who has, by his act, invested another with the apparent ownership of
his property, and by reason thereof is estopped from disputing the.
title of one who thereafter acquires it in good faith from such as-
signee of the real owner.

The other two cases above referred to were considered in the case·
of Davis v. Bechstein, 69 N. Y. 440.    That action was brought to
have a bond and mortgage on lands belonging to the plaintiff set
aside and canceled.    The bond and mortgage were executed by the
plaintiff and her husband to Lawrence A. Riley. and delivered to him
as an accommodation, to be used as collateral security for the pay-
ment of a note which he contemplated getting discounted, and under·
an agreement with him that he should not have the same recorded.
Riley failed to procure the discount.    The plaintiff requested the·
return of the bond and mortgage.    Riley promised to return the
same from time to time, but failed to do so.    He had the mortgage·
recorded, and assigned the bond and mortgage, for a valuable con-·
sideration, to the defendant Bechstein.    The latter had no notice of·
the agreement under which the bond and mortgage were delivered to·
Riley.    A judgment was entered in favor of the plaintiff, declaring
the bond and mortgage in suit void, and directing the defendant Bech-
stein to surrender and deliver up the same.    Chief Justice Church,.
delivering the opinion of the court, says:

"Neither the decision in McNeil v. Bank, 46 N. Y. 325, nor in Moore v. Bank,
55 N. Y. 41, affects the question involved in this case.    Those cases hold
that the owner of a chose in action is estopped from asserting his title against·
a bona fide purchaser for value, who purchased upon the faith of apparent
absolute ownership by assignment, conferred by the owner upon the assignee
and seller;   but neither of them intimated an intention to interfere with
the well-settled principle that a purchaser of a chose in action takes it sub-·
ject to the equities between the original parties, and that the assignor can give
no better title than he himself has.   *   *   *   At the time Riley transferred
the bond and mortgage to the defendant Bechstein, as between him and the
plaintiff, the mortgagor, he had no title or interest which he could transfer.
The mortgage was executed and delivered to him as an accommodation, to·
be used as collateral security for the payment of a note of $2,000, which he·
contemplated getting discounted at the New York National Exchange Bank,
and under an agreement not to have it recorded.    He failed to procure that
discount, and the plaintiff repeatedly requested the return of the bond and·
mortgage, and Riley promised to return the same from time to time.    It is
very clear that the bond and mortgage in his hands were of no value, and
that he could not have enforced them, and the defendant, when he pur-
chased, occupied no better position.    Riley could not sell any better title
than he had, which was none, and the defendant could not acquire by the
purchase from him any better title."

See, also, Rapps v. Gottlieb, 142 N. Y. 164, 36 N. E. 1052, and Voor-·
his v. Olmstead, 66 N. Y. 113, 114.

A careful examination of this case convinces me that it comes
within the rule herein stated, and forms no exception thereto.    The
judgment herein is in accordance with, and justified by, such rule, and
should be affirmed, with costs.